JULY TERM, 1882, No. 160.                    JANUARY 19, 1883.

## Philadelphia & Reading Railroad Company *v*. Noar.

In an action against the railroad company to recover damages for the death of a minor, caused by a collision between a locomotive owned by defendant and a wagon in which the minor was seated with an elder brother, there was evidence that before driving on the track they stopped to look and listen. *Held*, the witnesses appearing to differ as to the proper place, that whether they stopped at a favorable and suitable place to see and hear an approaching train could not be ruled as a matter of law. *Held*, further, that the distance from the track and the intervening objects either wholly or partially obstructing the view were questions to be considered by the jury.

Before MERCUR, C. J.; GORDON, PAXSON, TRUNKEY, STERRETT, and GREEN, JJ.

Error to the Court of Common Pleas, No. 2, of *Philadelphia County*.

Case by Isaac Noar, suing for himself and in behalf of his wife, as parents of Moses Noar, a minor, against the Philadelphia & Reading Railroad Company, to recover damages for the death of Moses Noar.   Plea: Not guilty.

On the trial before HARE, J., the following facts appeared:

The accident which was the origin of this suit took place about five o'clock on Saturday afternoon, August 16, 1879, on Norris street, just east of Tenth street, in the city of Philadelphia.   The main line of the Germantown & Norristown Railroad (operated by the defendant) running out Ninth street crosses Norris street upon a bridge.   Adjoining the west side of the railroad, and between it and Tenth street, are two large yards used for the storage of heavy merchandise; one extending from Berks street to Norris street, and the other from Norris street northward to near Diamond street.   Each yard was surrounded by a fence extending along Norris and Tenth streets.   That around the southern lot was seven feet five inches high.   Access to these yards is obtained by a spur track, which, leaving the main line at a point near Diamond street, descends through the north yard to the lower level, crosses Norris street at its grade and enters the south yard, where it divides into two branches.   This track crosses Norris street at a point sixty-five feet distant from the east curb line of Tenth street, passing through gates in the fence.   On the afternoon in question, which was rainy, with an east wind, the deceased and an elder brother, Leberman Noar, were driving east on Norris street to Tenth street, which is at right angles with Norris street.   There is a passenger railway track upon Tenth street, and as the Noars approached this point, a passenger railway car, going south upon Tenth street, was about to cross Norris street.   The street car was eleven feet high.   Leberman Noar knew that he had to cross the railroad track.   On either side of Norris street from Tenth eastward, as stated above, was a fence.   In the south yard there was a locomotive attached to a train of cars.   The top of the smoke-stack was about thirteen and a half feet from the ground.   There was a pile of lumber just inside of this yard rising higher than the fence.

*Leberman Noar* testified in substance, *inter alia:*

I was going down east.   I stopped before I reached Tenth street to see whether there was a train crossing Norris street.   When the street car came I waited to let

it pass. I waited at Tenth and Norris to let it pass. Before the street car entirely cleared me I made a turn towards the rear platform. Walked down Norris street. Drove down Norris street. I mean that I walked the horse down Norris street. I passed behind the street car. The street car went southward, downward. Then I says to my brother, "Here is the railroad." I went down Tenth street, and, as I got opposite the gate, the locomotive struck me and threw my brother on the track, killed him, and threw me on the bumper of the engine. I say I stopped just as I reached Tenth street. I stopped to look and listen for the railroad, to see if there was any cars coming. There was no flagman there. I heard no bell. I heard no bell or whistle. . . . There was a lumber pile right at the open gate, from behind where the locomotive emerged. The lumber pile was a good bit higher than the fence was at that time.

Upon cross-examination, he said:

I and my brother were both in the wagon. It was an open wagon. . . . I came down at a trot as far as Tenth street. I didn't stop at any place until I got to Tenth street. I stopped just as I got to the west side of Tenth street. . . . I stood still. I stood still until the street car passed me, all but, perhaps, the length of the rear platform, and then I kind of made a curve and went by it. . . . I knew that there was a track there. . . . I was sitting on the wagon, about eight feet high; that is, my eyesight was eight feet above the ground. . . . I slacked. Before you can stop a horse altogether you have to slack him down. I slacked, and then, when I got to Tenth street, I stopped altogether. I mean to say that I came to an absolute standstill. I had to do it to let the car go by.

*William King*, for the plaintiff, testified in substance, *inter alia*:

I was behind the car, but not on the track, next to the curb. As he came to the crossing the car was in his way and he had to stop. He went between the car and me. After he crossed Tenth street, and was going down a piece, I saw a locomotive.

Upon cross-examination, he said:

As he came to the crossing the car was in his way, and he had to stop. He couldn't go through the car . . . The car was enough ahead of me to make him stop his team before he could pass, and then he could not pass until I drew up a little, in that way, to let him go through. He was passing this way. He couldn't get far. He was

too far advanced to go ahead of the car and to come back the other way, he had to hesitate a moment and stop there to let the car go by. . . . He was coming down. He might have been in a trot. He might have had his horses pacing along. I don't recollect that. . . . He drove around in the rear of the street car between me and my wagon. He had to do it. He couldn't get in front, and had to wait until he could get through, and he came between the car and I.

"Q. He turned out to the left in order to go behind the street car, and passed between you and the street car; he didn't wait until the street car got by?

A. Well, that is a pretty particular point. I couldn't say that he did or didn't." . . . Well, it is a particular point to say that he was perfectly still, but he had to stop. I saw him stopping his horse. That is what we would call to stop a horse, to bring him in when you found that there was an obstacle.

*Joseph Yeakel*, for the plaintiff, testified in substance, *inter alia:*

I saw these two young men driving down . . . When they came down near Tenth street there was a car coming down on Tenth street. I saw they held the horse back. I can't tell you whether they stopped altogether or not, but I know they held it back and waited until the car passed. He did, still. I saw that. He was kind of driving around.

Upon cross-examination, he said:

When they passed me they were going on a trot. They went a regular good trot, and I had my eyes on them from that time until the engine struck them. I saw about how things turned out. I noticed that the car came down and they had to hold the horse back and go around the car. What they did when they were going down on a good trot, down Tenth street, and the street car came, was to pull the horse in and slacken him, and then turned in the rear of the street car. That is what I saw, but they didn't make much of a turn. I saw they were in a hurry because it looked—it was raining. They wouldn't like to wait so long, and it seemed to me that they tried to get through before the car had all gone. They made a kind of a little bend. That is the way it looked to me. . . . They had their heads down. I can't say whether they stopped altogether or not. I don't mean to say that they stopped, but they were holding back the horse. They had to hold him a little back, because they couldn't get through on account of the street car there. They slacked the speed of the horse. He wasn't going so fast there as

before. Of course, that is the way they did, but whether they stopped altogether, that I can't say. I know they held back until the car passed. I can't say whether they stopped altogether or not. There was nothing to prevent me seeing them if they had stopped.

Upon reaching the railroad crossing, the locomotive, coming out of the south yard, struck the wagon, threw Moses Noar on the track and killed him, and threw Leberman Noar on the bumper of the engine.

The defendant produced evidence to show that the engine whistle was blown before starting; that the bell was rung continuously from the time the train commenced moving until the collision; that a flagman was there and endeavored to stop the plaintiff; that the Noars never slacked a bit, but were going as fast as they could go.

Counsel for defendant presented the following point for charge: "That, from the evidence in this case, Leberman Noar was guilty of negligence in approaching and crossing the defendant's track at Norris street, and that therefore the plaintiff cannot recover."

The Court declined to charge as requested by defendant.

May 3, 1882. Verdict for the plaintiff for $3,500, which by *remittitur* was reduced to $2,000, upon which judgment was afterwards entered.

The defendant then took out a writ of error, assigning as error the refusal to charge as requested in the above point, and the submission of the question of contributory negligence as one of fact to the jury.

*Thomas Hart, Jr.*, for plaintiff in error.

If the undoubted evidence clearly shows contributory negligence, the Court should say that there can be no recovery: R. R. v. Fortney, 9 Nor., 323; Nagle v. R. R., 7 Norris, 35; R. R. v. Boudrou, 11 *Id.*, 481; R. R. v. Hoosey, 12 W. N. C., 1. The evidence shows that Noar went on deliberately after seeing, or when he ought to have seen the engine. It will not do to stop where one cannot see, and it is not enough merely to stop and then pass immediately on: R. R. v. Feller, 3 Norris, 226; Carroll v. R. R., 12 W. N. C., 348; Gerety v. R. R., 31 P. F. Sm., 274; R. R. v. Boyer, 1 Out., 91; R. R. v. Houston, 5 Otto, 697.

*Henry Reed* and *Wm. W. Wiltbank* for defendant in error.

Under the evidence, the question of contributory negli-

[Seidel *v.* Bauer.]

gence was for the jury: R. R. *v.* Fortney, 9 Norris, 323. The facts were disputed and the jury decided them in favor of the plaintiff: R. R. Co. *v.* Coyle, 5 P. F. Sm., 396; R. R. Co. *v.* Goodman, 12 *Id.*, 329; Weiss *v.* R. R. Co., 29 *Id.*, 387. This is a case for argument on a rule for a new trial, and not a case for review as to suggested error in law: R. R. Co. *v.* Coyle & R. R. Co., *v.* Goodman, *supra*.

JANUARY 29, 1883.—PER CURIAM : This case was clearly one for the jury. The boy was riding in a wagon in company with his elder brother. They were crossing the track of the railroad, when the wagon was struck by a passing locomotive, and the boy killed. There was evidence that, before driving on the track, they stopped to look and listen. Whether they stopped at a favorable and suitable place to see and hear an approaching train, cannot be ruled as a matter of law under the evidence given. The witnesses appear to differ as to the proper place. The distance from the track, and the intervening objects either wholly or partially obstructing the view, were questions to be considered by the jury, and there was no error in refusing to take the case from them.

Judgment affirmed.